UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ARMEN HACOPIAN-ARMEN<br>and LUSINE HAYRAPETYAN,<br><br>                              Plaintiffs,<br><br>    v.<br><br>BLACKROCK, INC.<br>and JOHN DOE ENTITY 1.<br><br>                              Defendants. | **<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs, Armen Hacopian-Armen ("Mr. Hacopian") and his wife, Lusine Hayrapetyan ("Ms. Hayrapetyan") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, file this class action complaint against Blackrock, Inc. ("BlackRock") and John Doe Entity 1, and allege as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      This lawsuit concerns Defendants' surreptitious electronic monitoring, interception and collection of personal and financial data of former employees and other individuals formerly associated with BlackRock, including illegally monitoring their and their family's personal trading accounts after their employment or other work relationship with BlackRock has ended.

2.      Mr. Hacopian is a former BlackRock employee. Defendants continued to monitor Mr. Hacopian's personal trading accounts after BlackRock laid him off, along with the accounts of his wife, Ms. Hayrapetyan, and their minor daughter. Defendants monitored Plaintiffs' eight personal trading accounts for almost a year following Mr. Hacopian's separation from BlackRock. This monitoring gave Defendants illegal access to Plaintiffs' sensitive financial information and violated state and federal data and personal privacy laws.

3.      In addition, BlackRock's continued unlawful monitoring of Plaintiffs' personal financial accounts for nearly one year following Mr. Hacopian's termination was in breach of BlackRock's Personal Trading Policy ("PTP"), which applies to BlackRock employees and other current workers.  BlackRock's breach of the PTP caused an approximately week-long delay in Mr. Hacopian receiving a deposit of $5,000, as BlackRock continued to represent itself (falsely) to financial institutions as Mr. Hacopian's employer with authorization to approve his personal financial transactions.

4.      Plaintiffs' experiences are not unique.

### PARTIES

5.      Plaintiff Armen Hacopian-Armen resides in New York State. He is married to Plaintiff Lusine Hayrapetyan. Mr. Hacopian was a BlackRock employee until February 2024.

6.      Plaintiff Lusine Hayrapetyan resides in New York State. She is married to Plaintiff Armen Hacopian-Armen.

7.      Defendant BlackRock is the world's largest asset manager. The firm manages assets on behalf of institutions and individuals worldwide through a variety of equity, fixed income, cash management, and alternative investment products. It has thousands of employees in the United States. It has offices throughout the United States, Europe, Asia, Australia, and the Middle East. It is a corporation organized under the laws of the State of Delaware and headquartered in the Southern District of New York.

8.      John Doe Entity 1 – Companies like BlackRock often engage a vendor to help monitor employees' and associates' trade activity. These vendors often afford companies like BlackRock a full view of employee and associate brokerage accounts through a network of direct broker electronic feeds.

## JURISDICTION and VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.* (the "Wiretap Act").

10.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

11.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391 because Defendant BlackRock is located in this District and a substantial part of the events giving rise to this claim occurred in this District.

## FACTS

### BlackRock's Personal Trading Policy

12.     BlackRock's PTP governs the personal trading and investments of its employees and "contingent workers," which include temporary workers contracted through a third party to perform a short term, defined time-period, or specific project assignment. The Policy also applies to interns with a tenure of 6 months or more.

13.     BlackRock's employees, interns, and contingent workers are required to disclose brokerage or other investment accounts, including private investments, trusts or investment clubs in which they make investment decisions or have direct influence or control (such as joint ownership, trading authorization, or other authority to exercise investment discretion) or a direct or indirect beneficial ownership interest.

14.     For the most part, this includes the brokerage and investment accounts of spouses, domestic partners, dependent children, and any other person on behalf of whom the person subject to the PTP makes investment decisions or has direct influence or control. (Contingent workers are

3

not required to disclose the accounts of spouses or dependent children unless the account is joint or otherwise in the name of the contingent worker as a custodian or trustee.)

15.    Everyone subject to the PTP must, within 10 days of joining BlackRock, provide their securities holdings information, as well as account information for every account required to be disclosed.

16.    The PTP provides, in relevant part, that "[p]rior approval via BlackRock's Personal Trading platform ("PTA") will be required before you are permitted to undertake certain personal investments."

17.    Everyone subject to the PTP is required to conduct their personal trading through a BlackRock Approved Broker, and prior approval through BlackRock's Personal Trading Assistant platform is required before individuals are permitted to undertake certain personal investments. (Contingent workers are not required to move their accounts to an approved Broker.)

18.    Approved Brokers generally provide an electronic feed of personal trading activity directly to BlackRock.

**Plaintiffs' Experience**

19.    Mr. Hacopian joined BlackRock in July 2018, as a Vice President in the firm's Manhattan headquarters.

20.    Pursuant to the PTP, during Mr. Hacopian's employ, Plaintiffs were required to allow BlackRock to monitor their family's personal brokerage and/or investment accounts.

21.    Mr. Hacopian was required to disclose all brokerage or investment accounts that he directly or indirectly influenced or controlled or in which he enjoyed a beneficial ownership interest. This included the brokerage and investment accounts of Ms. Hayrapetyan and their

financially dependent daughter. As required, Plaintiffs conducted their personal trading through a BlackRock approved broker.

22.    Plaintiffs consented to the monitoring only for as long as Mr. Hacopian was employed by BlackRock.

23.    Mr. Hacopian was laid off in 2024, as part of a reduction in force. Mr. Hacopian's "Last Day Worked" was January 10, 2024, and his employment with BlackRock terminated on February 9, 2024.

24.    Plaintiffs did not consent to having Defendants continue to monitor, intercept and collect their personal and financial data after Mr. Hacopian's employment at BlackRock terminated; Defendants were required to cease monitoring his and his family's trading accounts on February 9, 2024.

25.    In an abundance of caution, on February 9, 2024, in an email with the subject-line "Clearance," Mr. Hacopian asked BlackRock Human Resources to confirm that he was no longer subject to BlackRock's monitoring policies. This inquiry generated case number HRC1083880.

26.    On February 14, 2024, at HR's behest, Mr. Hacopian emailed "contacthr@blackrock.com," "pta-help@blackrock.com," and Sean Gunter to inform them that he separated from BlackRock on February 9, 2024, and to confirm that he was no longer subject to any restrictions and preclearance requirements, and that he could freely trade in his trading accounts.

27.    On February 15, 2024, Mr. Gunter told Mr. Hacopian that he was free to do so.

28.    Nonetheless, Defendants did not turn off the electronic feed; they knowingly continued to surreptitiously monitor and intercept Plaintiffs' personal trading account information.

29.     On or about May 2024, Plaintiffs' brokerage accounts were migrated from TD Ameritrade to Charles Schwab ("Schwab"), as a result of a corporate acquisition. Plaintiffs' TD Ameritrade accounts were assigned new, Schwab account numbers.

30.     Defendants were made aware of the changes, and they were thereby afforded yet another opportunity to cease monitoring Plaintiffs' accounts and turn off the illegal electronic feed.

31.     Nonetheless, again, Defendants did not turn off the electronic feed; they knowingly continued to surreptitiously monitor and intercept Plaintiffs' personal trading account information.

32.     On or about January 2, 2025, Mr. Hacopian learned that, despite having been separated from BlackRock for almost a year, Defendants' electronic feed was still active, and they were still monitoring his and his family's personal trading accounts.

33.     On or about the same day, Mr. Hacopian emailed "contactHR@blackrock.com" and "PTA-Help@BlackRock.com" to instruct BlackRock to "stop monitoring my accounts."

34.     He did not receive a response for four days.

35.     On January 6, 2025, BlackRock employee Lamar Holman informed Mr. Hacopian that he would have the issue "addressed ASAP."

36.     In that January 6 email, Mr. Holman instructed two other employees (Rajpal Singh and Abhinesh Jha) to "please have *all* the below ex-employees accounts removed from monitoring." (Emphasis in the original.)

37.     BlackRock's continued monitoring of the personal financial accounts of Plaintiffs well after Mr. Hacopian's termination also caused an approximately week-long delay in Mr. Hacopian's receipt of a $5,000 deposit.  On January 2, 2025, Mr. Hacopian was approved for a $5,000 bonus from Schwab.  However, as a condition precedent to receipt, approval was required

from BlackRock, who continued to monitor and represent itself (falsely) as Mr. Hacopian's employer with respect to Mr. Hacopian's personal financial accounts.

38.     In addition to the delay in Mr. Hacopian's receipt of funds as alleged above, because BlackRock abruptly laid-off Mr. Hacopian, Plaintiffs suffered financially, and they were forced to significantly draw down their retirement accounts early. The fact that Defendants electronically intercepted and monitored those grudging withdrawals after BlackRock unceremoniously laid off Mr. Hacopian humiliated and distressed Plaintiffs, aggravated certain preexisting health conditions, and caused significant loss of sleep.

39.     Mr. Holman's January 6 email confirms that Plaintiffs' accounts were not the only ones BlackRock illegally intercepted and monitored post-termination.

40.     BlackRock has more than 20 offices in the United States, employes thousands of people, and Mr. Hacopian was part of an approximately 600-person reduction in force.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs sue on their own behalf and on behalf of a class of individuals who have been injured by Defendants' policy and practice of illegally monitoring brokerage accounts, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4).

42.     Plaintiffs bring this action on behalf of the following Class:

> All individuals whose brokerage accounts Defendants continued to monitor after they separated from BlackRock (the "Class").

43.     The Class is so numerous that the joinder of all members is impracticable. Although the precise size of the class is presently unknown to Plaintiffs, this information is obtainable from Defendants' records.  It is estimated that the Class consists of more than 40 people.

44.     There are questions of law or fact common to the Class, which predominate over any questions affecting only individual Class members.   Among the principal common and predominating questions of law or fact, in this case, are the following:

    a.   Whether Defendants continued to monitor and electronically intercept individuals' brokerage accounts after those individuals separated from BlackRock;

    b.   Whether Plaintiffs and Class members consented to such monitoring and interception;

    c.   Whether Defendants' conduct violates the law; and

    d.   Whether Defendants are liable for damages.

45.     Plaintiffs' claims are typical of the claims of the Class, which all arise from the same operative facts and are based on the same legal theories. Moreover, there are no defenses available to Defendants that are unique to Plaintiffs.

46.     Plaintiffs will fairly and adequately protect the interests of the Class and are committed to vigorously pursuing this litigation. Further, Plaintiffs have retained counsel who are highly experienced in handling class actions, particularly large complex class actions involving substantial sums of money and complicated legal and factual issues. Neither Plaintiffs nor their counsel have any interests that conflict with or are antagonistic to those of the Class or which might cause them to not vigorously pursue this action.

47.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for the parties opposing any Class, as well as a risk of adjudication with

respect to individual members, which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impede or impair their ability to protect their interests.

48.    A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendants may be small given the amount of the actual damages at issue for each Class member and the burdens on their time and resources, but which in the aggregate are estimated to involve a large sum. Management of the action as a class action is likely to present significantly fewer difficulties than those presented by the assertion of thousands of individual claims. The identities of Class members can be obtained from the Defendants' records.

49.    Plaintiffs reserve the right to revise the class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## FIRST CLAIM FOR RELIEF
**Federal Wiretap Act**
**18 U.S.C. §§ 2510,** *et seq.*

50.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set forth herein.

51.    The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

52.    In relevant part, the FWA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

53.     The FWA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the FWA. 18 U.S.C. § 2520(a).

54.     The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

55.     The FWA defines "electronic communication" as "any transfer of signs, signals, […] data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

56.     The FWA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

57.     The FWA defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

58.     The FWA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

59.     Defendants are each a person as defined in 18 U.S.C. § 2510(6).

60.     18 U.S.C. § 2520 provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

61.    Defendants' actions in intercepting and monitoring the accounts of former employees and associates was knowing and intentional.

62.    Defendants, using an electronic feed, intentionally monitored and intercepted the accounts of former employees in real time, and the interceptions including "contents" of electronic communications, without authorization.

63.    The transmission of data relating to Plaintiffs' and class members' accounts were "transfer[s] of signs, signals, writing . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

64.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    The computer codes and programs Defendants used to monitor Plaintiffs' and the Class members' trading accounts;

b.    The Plaintiffs' and Class members' computing and mobile devices; and/or

c.    The computer codes and programs used by Defendants to effectuate the monitoring and interception of Plaintiffs' and Class members' trading accounts.

65.    Defendants, in their conduct alleged herein, were not providing an "electronic communication service" as that term is defined in 18 U.S.C. § 2510(12) and is used elsewhere in the FWA. Defendants are not acting as an Internet Service Provider.

66.    Defendants were not authorized parties to the communications, and Plaintiffs and Class members did not consent to Defendants' monitoring of their communications.

**SECOND CLAIM FOR RELIEF**
**N.Y. Civil Rights Law § 52-c**
**(Against Defendant BlackRock)**

67.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set forth herein.

68.    The New York Civil Rights Law requires employers who monitor or otherwise intercept electronic transmissions or internet usage by an employee to give prior written notice upon hiring to all employees who are subject to electronic monitoring.

69.    BlackRock failed to give employees and associates prior written notice that it would be monitoring or otherwise intercepting their electronic transmissions or internet usage even after they separated from the company.

70.    Plaintiffs and the Class members have been damaged by BlackRock's violations of the New York Civil Rights Law.

**THIRD CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Defendant BlackRock)**

71.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set forth herein.

72.    Plaintiff Hacopian and the other Class members formerly associated with BlackRock agreed to and complied with the terms and conditions of the BlackRock PTP during the period of their employment or other work engagement with BlackRock.

73.    BlackRock is and was obligated to comply with the terms of the PTP.

74.    The PTP provides, in relevant part, that:

Upon joining BlackRock . . . [y]ou will be required to disclose all brokerage or investment accounts that you have direct or indirect influence or control or a beneficial ownership interest in.  This includes the brokerage and investment accounts of your spouse or any financially dependent children . . . Prior approval via BlackRock's Personal Trading

platform ("PTA") will be required before you are permitted to undertake certain personal investments.

75.    BlackRock has breached the PTP by continuing to intercept and monitor the financial accounts of Plaintiffs and other members of the Class after the term of their employment or other work engagement with BlackRock has ended.

76.    Plaintiffs and other members of the Class have been damaged as a result of BlackRock's breach of the PTP.  Indeed, Plaintiff Hacopian was delayed approximately one week in receiving $5,000 that had been approved for deposit in his Schwab account on or about January 2, 2025.  Plaintiff Hacopian's delay in receiving these funds was a direct result of BlackRock's continued unlawful monitoring of Plaintiffs' account, and BlackRock's continued (false) representation to financial institutions that it remained the employer of Plaintiff Hacopian and other members of the Class and thus had authorization to approve their personal investments.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Covenant of Good Faith and Fair Dealing**
**(Against Defendant BlackRock)**

77.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set forth herein.

78.    A covenant of good faith and fair dealing is implied in every contract. This covenant imposes upon each party a duty of good faith and fair dealing in the performance of the contract and not to exercise any discretion in an unreasonable manner.

79.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

80.    BlackRock's standard form PTP permits BlackRock to monitor the financial accounts and trading activity, and to provide approval for personal financial transactions, of its employees and other current workers.

81.    Nothing in the PTP permits BlackRock to continue monitoring the financial accounts and trading activities, and provide approval for personal financial transactions, of former employees and other workers no longer associated with BlackRock.

82.    Once given access to monitor and approve employees and other current workers' personal financial accounts and financial transactions, and to provide approval for personal financial transactions, BlackRock thus is afforded substantial discretion to exercise this function in good faith.  BlackRock has failed to exercise its discretion in good faith by continuing to monitor and electronically intercept the personal financial account information of former employees and other workers formerly associated with BlackRock, and to continue to hold itself out (falsely) as their employer with authority to approve their personal financial transactions.

83.    BlackRock has breached the implied covenant of good faith and fair dealing, and it exercised its discretion under the PTP in bad faith, by continuing to monitor and electronically intercept personal financial information of individuals who no longer work for BlackRock and to falsely represent itself to financial institutions as the current employer with authority to approve the personal financial transactions of Plaintiffs and the other members of the Class.

84.    As a direct and proximate result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and other members of the Class have suffered damages, including, but not limited to, monetary damages and loss of interest revenue resulting from delays in personal financial transactions.

## JURY TRIAL DEMAND

85.    Plaintiffs demand a trial by jury of all issues as of right by a jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A.  Enter an order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and b(3) and/or c(4) for the class described herein, and appointing Plaintiffs and their counsel to represent the members of the class;

B.  Enter a judgment declaring illegal Defendants' practices;

C.  Award Plaintiffs and members of the Class statutory damages;

D.  Award Plaintiffs and members of the Class compensatory and economic damages in an amount to be determined at trial;

E.  Award Plaintiffs and members of the Class punitive damages in an amount to be determined at trial and sufficient to prevent the same or similar conduct by Defendants in the future;

F.  Award prejudgment and post-judgment interest;

G.  Award costs, expenses, expert fees, and reasonable attorneys' fees; and

H.  Grant such other and further relief as this Court deems just and proper.

Dated:       New York, New York
             March 20, 2025

                              **GISKAN SOLOTAROFF & ANDERSON LLP**

                    By:    _____/s/_____
                           Raymond Audain
                           Catherine Anderson
                           raudain@gslawny.com
                           canderson@gslawny.com
                           212-847-8315
                           90 Broad Street, 2nd Floor

New York, New York 10004

*Attorneys for Plaintiffs and the Class*