**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ARMEN HACOPIAN and LUSINE
HAYRAPETYAN, *individually and on behalf*
*of all others similarly situated*,

                          Plaintiffs,

        v.

BLACKROCK, INC. and JOHN DOE
ENTITY 1,

                         Defendants.

No. 1:25-cv-2361 (JSR)

Hon. Jed S. Rakoff

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BLACKROCK, INC.'S**
**MOTION TO DISMISS UNDER RULES 12(B)(1) AND 12(B)(6)**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL ALLEGATIONS ..................................................................................................2

    A.    BlackRock's Operations and Compliance Framework....................................2

    B.    Plaintiffs' Personal Trading Disclosures to BlackRock...........................4

    C.    Procedural History ..................................................................................5

LEGAL STANDARDS ..........................................................................................................6

ARGUMENT ........................................................................................................................7

I.    Plaintiffs Lack Standing Because They Have Not Alleged Any Injury-In-Fact ................7

    A.    A Brief Delay in a $5,000 Payment Is Not a Concrete Harm.................7

    B.    Plaintiffs' Alleged Emotional Distress Is Also Insufficient to Establish Standing ..................................................................................................9

    C.    Plaintiffs Do Not Allege Any Concrete Harm Arising from Alleged Violations of State and Federal Privacy Laws ........................................11

II.    Each Of Plaintiffs' Causes Of Action Is Inadequately Pled ..............................12

    A.    Plaintiffs Fail to State a Claim Under the Federal Wiretap Act ...........12

        1.    Plaintiffs cannot state a FWA claim because Plaintiffs' Approved Brokers consented ..........................................................13

        2.    No "interception" occurred because BlackRock did not acquire any communication contemporaneously with its transmission.........15

    B.    Plaintiffs' State Law Claims Are Legally Deficient .............................16

        1.    Plaintiffs' New York Civil Rights Law claim should be dismissed............16

        2.    The breach of contract claim should be dismissed......................19

        3.    The implied covenant claim should be dismissed ......................21

III.    Plaintiffs' Complaint Should Be Dismissed With Prejudice ..............................22

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................................................................6

*Backhaut v. Apple Inc.,*
148 F. Supp. 3d 844 (N.D. Cal. 2015), *aff'd*, 723 F. App'x 405 (9th Cir. 2018) ...................16

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................................................................6

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.,*
259 F. Supp. 3d 16 (S.D.N.Y. 2017)............................................................................20

*Bilello v. JPMorgan Chase Retirement Bank,*
649 F. Supp. 2d 142 (S.D.N.Y. 2009)..........................................................................17

*Caro v. Weintraub,*
618 F.3d 94 (2d Cir. 2010)..........................................................................................13

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002)..........................................................................................3

*Cohen v. Casper Sleep Inc.,*
2018 WL 3392877 (S.D.N.Y. July 12, 2018) ..........................................................14

*Cruz v. TD Bank, N.A.,*
855 F. Supp. 2d 157 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 520 (2d Cir. 2013) ..............................18

*Cuoco v. Moritsugu,*
222 F.3d 99 (2d Cir. 2000)..........................................................................................22

*Davis v. FEC,*
554 U.S. 724 (2008)................................................................................................6, 19

*DeMicco v. Home Depot USA, Inc.,*
101 F. Supp. 2d 122 (E.D.N.Y. 2000) ........................................................................20

*Democratic National Committee v. Russian Federation,*
392 F. Supp. 3d 410 (S.D.N.Y. 2019)..........................................................................15

*Denney v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006)..........................................................................................9

*DeRusso v. Church Aid of Protestant Episcopal Church in the Town of Saratoga Springs, Inc.*,
   223 N.Y.S.3d 442 (App. Div. 2025) ...................................................................................18

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009).............................................................................................6

*Harris v. Old Navy, LLC*,
   2022 WL 16941712 (S.D.N.Y. Nov. 15, 2022),
   *R&R adopted*, 2023 WL 2139688 (S.D.N.Y. Feb. 20, 2023)...................................8

*In re DoubleClick Inc. Privacy Litigation*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001)..........................................................13, 14

*International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*,
   62 F.3d 69 (2d Cir. 1995)...............................................................................................3

*Kunda v. Caremark PHC, LLC*,
   119 F. Supp. 3d 56 (E.D.N.Y. 2015) ..........................................................................20

*Kwok Sze v. Pui-Ling Pang*,
   2015 WL 6867134 (S.D.N.Y. Nov. 9, 2015)................................................................14

*Lateral Recovery, LLC v. Capital Merchant Services, LLC*,
   632 F. Supp. 3d 402 (S.D.N.Y. 2022).............................................................................3

*Laufer v. Ganesha Hospitality LLC*,
   2022 WL 2444747 (2d Cir. July 5, 2022) .....................................................................9

*Lobosco v. New York Telephone Co./NYNEX*,
   751 N.E.2d 462 (N.Y. 2001).........................................................................................20

*Maddox v. Bank of New York Mellon*,
   19 F.4th 58 (2d Cir. 2022) .................................................................................8, 9, 10

*McMorris v. Carlos Lopez & Assocs., LLC*,
   995 F.3d 295 (2d Cir. 2021)..........................................................................................12

*Rhulen Agency, Inc. v. Alabama Insurance Guaranty Ass'n*,
   896 F.2d 674 (2d Cir. 1990)............................................................................................6

*RM 14 FK Corp. v. Bank One Trust Co.*,
   831 N.Y.S.2d 120 (App. Div. 2007) .............................................................................21

*Rosario v. Icon Burger Acquisition LLC*,
   2022 WL 198503 (E.D.N.Y. Jan. 21, 2022) ..............................................................8, 9

*Rosner v. Star Gas Partners, L.P.*,
    344 F. App'x 642 (2d Cir. 2009) ........................................................................22

*Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Insurance Co.*,
    705 F. Supp. 3d 194 (S.D.N.Y. 2023) ..................................................................3

*Simpson v. New York City Transit Authority*,
    491 N.Y.S.2d 645 (App. Div. 1985) ....................................................................18

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004) ....................................................................................3

*Snyder v. Fantasy Interactive, Inc.*,
    2012 WL 569185 (S.D.N.Y. Feb. 9, 2012) ....................................................15, 16

*Tantaros v. Fox News Network, LLC*,
    2018 WL 2731268 (S.D.N.Y. May 18, 2018) ......................................................15

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F. Supp. 3d 441 (S.D.N.Y. 2014) ..................................................................22

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..........................................................................6, 7, 11, 12

*Trustpilot Damages LLC v. Trustpilot, Inc.*,
    2021 WL 2667029 (S.D.N.Y. June 29, 2021) ....................................................21

*Uhr by Uhr v. East Greenbush Central School District*,
    675 N.Y.S.2d 704 (App. Div. 1998) ....................................................................18

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001), *aff'd*, 279 F. App'x 14 (2d Cir. 2008) ......................21

*United States v. Amen*,
    831 F.2d 373 (2d Cir. 1987) ................................................................................14

*United States v. Parra*,
    302 F. Supp. 2d 226 (S.D.N.Y. 2004), *aff'd*, 249 F. App'x 226 (2d Cir. 2007) ....................20

*United States v. Rittweger*,
    258 F. Supp. 2d 345 (S.D.N.Y. 2003) ................................................................14

*Verschleiser v. Frydman*,
    2023 WL 5835031 (S.D.N.Y. Sept. 7, 2023) ......................................................15

*Worldhomecenter.com, Inc. v. KWC Am., Inc.*,
    2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011) ....................................................18

*Xu v. Reuters News & Media Inc.*,
　2025 WL 488501 (S.D.N.Y. Feb. 13, 2025)......................................................................6, 11

*Zachary v. BG Retail, LLC*,
　716 F. Supp. 3d 339 (S.D.N.Y. 2024)..............................................................................6, 19

**Statutes & Regulations**

18 U.S.C.
　§ 2510...........................................................................................................................13
　§ 2511...........................................................................................................................13
　§ 2520...........................................................................................................................13

N.Y. Civ. Rights Law
　§ 52-b ...........................................................................................................................18
　§ 52-c ...........................................................................................................................17
　§ 52-d ...........................................................................................................................18

**Other Authorities**

S.2628, 2021-2022 Leg., Reg. Sess. (N.Y. 2021)....................................................................17

## PRELIMINARY STATEMENT

BlackRock, Inc., the world's largest asset manager, has rigorous internal compliance practices designed to ensure that the firm strictly adheres to the federal securities laws and ethical, regulatory, and statutory guidelines. As part of this compliance framework, BlackRock maintains a Personal Trading Policy ("PTP") under which employees authorize their brokers to send BlackRock information related to their personal trading accounts and to obtain BlackRock's approval before executing personal trades. This allows the firm to assess whether a proposed trade would contravene applicable law or BlackRock's ethical standards.

Armen Hacopian acknowledges he complied with the PTP during his time as a BlackRock employee by authorizing his brokers to send information about his personal trading activity to BlackRock for compliance review, and alleges that BlackRock continued to receive this information for a limited period of time after his termination from the firm. On this basis alone—that BlackRock continued to receive information it had already been authorized to receive—Hacopian and his wife Lusine Hayrapetyan now bring a scattershot of meritless claims against BlackRock for violations of federal and state law, despite the absence of any allegation that BlackRock improperly reviewed, used, or disclosed any information it received. Plaintiffs' Complaint fails many times over.

To start, Plaintiffs do not come close to establishing Article III standing to sue. Their alleged harms—a one-week delay in accessing a $5,000 deposit to Hacopian's brokerage account, without any corresponding economic loss, generalized assertions of emotional distress, and a bare procedural violation of an (inapplicable) federal statute—fall far short of the concrete injury required to establish Article III standing.

1

Even if they could establish standing, Plaintiffs' central claim of a federal Wiretap Act ("FWA") violation is fatally flawed. As an initial matter, consent by any party to a communication bars liability under the FWA, and the Complaint makes clear that Plaintiffs' brokers consented to sharing with BlackRock the information Plaintiffs now (incorrectly) allege BlackRock illegally intercepted. But regardless, even if Plaintiffs' FWA claim were not barred by their brokers' clear consent (and it is), the Complaint does not—and indeed, cannot—allege facts sufficient to demonstrate that BlackRock "intercepted" any communication contemporaneously with its transmission—an indispensable element of a FWA claim.

Plaintiffs' supplemental state-law claims are frivolous: the New York employee privacy statute Plaintiffs invoke does not apply here, nor does it provide a private right of action; BlackRock's PTP (which Plaintiffs conspicuously fail to attach to their Complaint) does not constitute an enforceable contract; and Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing cannot stand because, among other things, it duplicates entirely their contract claim.

Simply put, Plaintiffs' baseless lawsuit, which identifies no cognizable injury nor any plausible violation of law, does not belong before this Court. The Court should dismiss Plaintiffs' Complaint in its entirety, with prejudice.

## FACTUAL ALLEGATIONS

### A.     BlackRock's Operations and Compliance Framework

BlackRock is the world's largest asset manager, overseeing investments on behalf of institutions and individuals worldwide. Compl. ¶ 7. BlackRock provides a wide array of investment solutions, including equity, fixed income, cash management, and alternative investment products. *Id.* With thousands of employees across approximately 20 offices in the

United States, as well as an extensive international presence, BlackRock maintains operations throughout North America, Europe, Asia, Australia, and the Middle East. *Id.* ¶¶ 7, 40.

BlackRock's PTP governs the personal trading and investment activity of employees. Compl. ¶ 12. The PTP—incorporated by reference and attached as Exhibit 1 to the Declaration of Alan Schoenfeld in Support of BlackRock's Motion to Dismiss—is intended to ensure that employees "place the interests of [BlackRock] clients first and avoid transactions, activities, and relationships that might interfere or appear to interfere with making decisions in the best interests of clients of BlackRock." Schoenfeld Decl. Ex. 1 (hereinafter, "PTP") at 1.[1] In furtherance of these goals, the PTP mandates that employees and specified contingent workers disclose brokerage accounts over which they possess a direct or indirect interest—including, in certain cases, accounts held by spouses and dependent children—and secure prior approval for certain personal trades via BlackRock's Personal Trading Assistant platform. Compl. ¶¶ 13-14, 16; *see also* PTP at 1-3. Under the PTP, employees must conduct their personal trading through a BlackRock Approved Broker. Compl. ¶ 17; PTP at 2. "Approved Brokers generally provide an electronic feed of

---

[1] The Court may consider the PTP as part of the pleadings because it has been "incorporate[d] by reference" into the Complaint and is "integral" to it. *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Ins. Co.*, 705 F. Supp. 3d 194, 200 (S.D.N.Y. 2023). "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the document." *Id.* (quoting *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 440 (S.D.N.Y. 2022)). Plaintiffs refer to the PTP extensively throughout the Complaint, relying on the PTP for their allegations regarding BlackRock's policies and as the alleged basis for Plaintiffs' contract claims. *See, e.g.*, Compl. ¶¶ 3, 12-18, 20, 72-83; *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (documents referenced in the complaint to frame allegations and support claims are incorporated by reference). The PTP is also "plainly integral" to the Complaint, as Plaintiffs "rel[y] upon [the] 'terms and effect' of" the PTP as the basis for their lawsuit. *Rowe Plastic Surgery*, 705 F. Supp. 3d at 200 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (concluding that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint … renders the document 'integral' to the complaint").

employee personal trading activity directly to BlackRock." Compl. ¶ 18; PTP at 2. The PTP does not specify whether or when this electronic feed will be shut off following an employee's termination or departure from BlackRock. *See generally* PTP at 1-19.

**B.    Plaintiffs' Personal Trading Disclosures to BlackRock**

Armen Hacopian was hired as a Vice President at BlackRock's New York headquarters in July 2018. Compl. ¶ 19. Pursuant to the PTP, Hacopian disclosed to BlackRock his own brokerage and investment accounts as well as the brokerage and investment accounts of his wife Lusine Hayrapetyan, and their daughter. *Id.* ¶ 21. As required under the PTP, Plaintiffs also conducted their trading through a BlackRock Approved Broker. *Id.*

Hacopian's employment with BlackRock ended on February 9, 2024, as part of a company-wide reduction in force. Compl. ¶ 23. Plaintiffs allege that after his termination, BlackRock continued to receive an electronic feed of their personal trading activity from their Approved Broker, including after Plaintiffs' brokerage accounts were migrated from TD Ameritrade to Charles Schwab in May 2024. *Id.* ¶¶ 28-31. On January 2, 2025, Schwab informed Hacopian that it required approval from BlackRock in order to deposit a $5,000 bonus payment in Hacopian's brokerage account. *Id.* ¶ 37. On or around the same day, Hacopian emailed BlackRock's corporate compliance and human resource teams to instruct BlackRock to "stop monitoring [his] accounts." *Id.* ¶ 33. Plaintiffs do not allege that BlackRock continued to monitor their personal trading accounts after that time.

Plaintiffs allege that BlackRock's continued monitoring of their personal trading activity from February 2024 through January 2025 gave BlackRock "illegal access to Plaintiffs' sensitive financial information." Compl. ¶ 2. But as to the specific harms Plaintiffs say they suffered as a result of BlackRock's alleged "illegal access" and continued monitoring, Plaintiffs identify only a

one-week delay in Hacopian's receipt of a $5,000 bonus payment from Schwab. *Id.* ¶ 37. Plaintiffs do not allege any financial loss stemming from BlackRock's alleged continued monitoring—only this temporary delay in the delivery of funds. *Id.* Plaintiffs further allege that as a result of Hacopian's termination "they were forced to significantly draw down their retirement accounts early," and that BlackRock's alleged monitoring of these "grudging withdrawals" caused them humiliation and distress, "aggravated certain preexisting health conditions, and caused significant loss of sleep." *Id.* ¶ 38.

## C. Procedural History

Plaintiffs bring one claim under the Federal Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*, against BlackRock and a John Doe defendant based on Defendants' alleged "knowing and intentional" interception and monitoring of Plaintiffs' personal trading accounts following Hacopian's termination. [2] *See* Compl. ¶¶ 50-66. Plaintiffs also bring state law claims against BlackRock for violation of Section 52-c of the New York Civil Rights Law, as well as for breach of contract and breach of the implied covenant of good faith and fair dealing based on alleged violations of the PTP. *Id.* ¶¶ 67-84. Plaintiffs bring their claims on behalf of themselves and a putative class of "[a]ll individuals whose brokerage accounts Defendants continued to monitor after they separated from BlackRock." *Id.* ¶ 42.

---

[2] As to the John Doe defendant, Plaintiffs allege only that "[c]ompanies like BlackRock often engage a vendor to help monitor employees' and associates' trade activity," and that such vendors "often afford companies like BlackRock a full view of employee and associate brokerage accounts through a network of direct broker electronic feeds." Compl. ¶ 8. Given that the Doe defendant has not been identified or served, BlackRock need not, and does not, address Plaintiffs' claim against the Doe defendant. BlackRock reserves all rights to move to dismiss Plaintiffs' claims against the Doe defendant as appropriate, if and when the Doe defendant is identified and served.

## LEGAL STANDARDS

Plaintiffs bear the burden of establishing standing for each of their claims. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross."). This requires that Plaintiffs demonstrate "an injury in fact that is concrete, particularized, and actual or imminent" with respect to each claim. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To be concrete, the alleged injury must be within the category of harms that courts have "'traditionally' recognized as providing a basis for a lawsuit in American courts," *id.* at 414, such as "physical, monetary, or reputational harm," *Xu v. Reuters News & Media Inc.*, 2025 WL 488501, at *3 (S.D.N.Y. Feb. 13, 2025). Plaintiffs must satisfy this "constitutional minimum" whether their claim arises under state or federal statutes, *see Zachary v. BG Retail, LLC*, 716 F. Supp. 3d 339, 345 (S.D.N.Y. 2024), or under the common law, *see TransUnion*, 594 U.S. at 427.

To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and provide more than a "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (internal quotation marks and alterations omitted). The Court need not accept bare legal conclusions included in the Complaint. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1) as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (internal quotation marks and citation omitted).

**I.      Plaintiffs Lack Standing Because They Have Not Alleged Any Injury-In-Fact**

To establish Article III standing, and thus to establish subject matter jurisdiction, Plaintiffs must show "an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423. This requirement applies to both statutory and common law claims, because "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427; *see also id.* ("[U]nder Article III, an injury in law is not an injury in fact.").

Here, Plaintiffs claim injury based on (1) a roughly one-week delay in Hacopian's receipt of a $5,000 bonus payment from his broker, *see* Compl. ¶¶ 37, 76; (2) alleged emotional distress, aggravation of "certain preexisting health conditions," and "significant loss of sleep" caused by BlackRock's alleged knowledge that Plaintiffs "dr[ew] down" their retirement accounts following Hacopian's termination, *id.* ¶ 38; and (3) BlackRock's alleged "illegal access to [and monitoring of] Plaintiffs' sensitive financial information," *id.* ¶ 2. None of these alleged harms is concrete enough to establish standing.

**A.      A Brief Delay in a $5,000 Payment Is Not a Concrete Harm**

Plaintiffs allege that BlackRock's continued monitoring of their personal financial accounts "caused an approximately week-long delay in Hacopian's receipt of a $5,000 deposit" from his broker. Compl. ¶ 37. Notably absent from the Complaint, however, is any well-pled allegation of tangible economic injury tied to this delay. Plaintiffs make a general allegation (only in connection with their implied covenant claim) that Plaintiffs and the putative class "have suffered … monetary damages and loss of interest revenue resulting from delays in personal

financial transactions." *Id.* ¶ 84. But they do not tie this general allegation to Hacopian's own allegedly delayed payment, nor do they identify any other measurable loss resulting from the delay.

Instead, Plaintiffs' factual allegations establish at most that Hacopian's payment arrived slightly later than expected. Courts have found that this slight delay, on its own, is insufficient to establish Article III standing. In *Maddox v. Bank of New York Mellon*, for instance, the Second Circuit held that a delay of *one year* in recording mortgage satisfaction was insufficient to confer standing absent allegations of "a cloud [of title], reputational harm, or any other injury" connected to the delay. 19 F.4th 58, 66 (2d Cir. 2022); *see also id.* at 64 ("[T]he determinative standing issue is whether [plaintiffs] suffered a concrete harm due to the Bank's [delay]. It is clear that they have not."). Courts applying *Maddox* in the context of delayed wage payments have likewise concluded that while "the late payment of wages can constitute a concrete harm sufficient to confer standing," a plaintiff is nevertheless required to plead specific facts showing concrete injury arising from the delay itself. *Rosario v. Icon Burger Acquisition LLC*, 2022 WL 198503, at *3 (E.D.N.Y. Jan. 21, 2022) (finding allegations insufficient to satisfy Article III standing requirements where the complaint "contain[ed] no facts from which the Court could plausibly conclude that Plaintiff actually suffered the sort of harm that would entitle him to relief" as a result of his alleged delayed payment); *cf. Harris v. Old Navy, LLC*, 2022 WL 16941712, at *4 (S.D.N.Y. Nov. 15, 2022) (plaintiff established standing by alleging a "delay in payment [that] deprived her of the ability to invest, save, or spend that money," distinguishing her case from "cases where a plaintiff failed to plead any injury at all from delayed payment"), *R&R adopted*, 2023 WL 2139688 (S.D.N.Y. Feb. 20, 2023).

Plaintiffs' allegations echo the same deficiencies highlighted in *Maddox* and *Rosario*, and fail to rise to even the bare-minimum allegations of harm found sufficient in *Harris*. That is,

Plaintiffs have not established actionable, concrete injury resulting from Hacopian's delayed payment, such as lost interest, missed opportunities, or tangible financial loss. Plaintiffs therefore "cannot plausibly claim [they] suffered a harm sufficiently concrete to establish Article III standing." *Rosario*, 2022 WL 198503, at *3.

### B. Plaintiffs' Alleged Emotional Distress Is Also Insufficient to Establish Standing

Though emotional distress can form the basis for Article III standing, *see Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006), courts examine such claims with scrutiny. "[W]hen relying on allegations of emotional distress to establish standing, plaintiffs 'must plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief.'" *Laufer v. Ganesha Hosp. LLC*, 2022 WL 2444747, at *3 (2d Cir. July 5, 2022) (citing *Maddox*, 19 F.4th at 65-66).

Plaintiffs' "perfunctory allegations of emotional distress" fall far short of that mark. *Maddox*, 19 F.4th at 65-66. The Complaint offers a single paragraph describing their allegations of emotional distress: they were "humiliated and distressed" that BlackRock was allegedly still monitoring their finances, including withdrawals from their retirement accounts following Hacopian's termination, which "aggravated certain preexisting health conditions" and "caused significant loss of sleep." Compl. ¶ 38. These are broad generalities, unsupported by any specific factual allegations. Plaintiffs do not identify what health conditions were exacerbated, or how. They do not describe any medical treatment sought, any diagnosis of stress-related illness, or any specific incidents (such as panic attacks or other acute episodes) that resulted from learning that BlackRock allegedly continued to monitor their accounts, just as it had done during the entire six years of Hacopian's employment. Nor do they identify any specific retirement accounts they

withdrew from as a result of Hacopian's termination or whether those accounts—and more specifically, withdrawals from those accounts, as opposed to trading activity—were subject to disclosure or monitoring under the PTP. *See* PTP at 2 (identifying categories of investment accounts not subject to disclosure); Compl. ¶¶ 2, 18 (alleging BlackRock "continued to monitor" Hacopian's "personal *trading* accounts" and continued to receive a feed of "personal *trading* activity" (emphasis added)).

Further, the Complaint itself undermines any assertion of emotional harm resulting from Plaintiffs' general awareness of BlackRock's alleged continued monitoring. Plaintiffs admit that Hacopian only discovered the continued feed in January 2025, at which point he contacted BlackRock; the issue was resolved within a matter of days (between January 2 and January 6, 2025). Compl. ¶¶ 33-36. After January 6, BlackRock was no longer monitoring Plaintiffs' accounts. *Id.* ¶ 36. In other words, the period during which Plaintiffs were aware of the allegedly unwanted monitoring and could have been emotionally affected by it was extremely short. Any emotional impact during this brief interval would have amounted, at most, to transient upset or frustration—far short of actionable distress.

Because the Complaint does not allege facts establishing "any reason why" BlackRock's alleged continued monitoring would "cause great stress, mental anguish, anxiety, and distress," which in any event would be "wholly incommensurate with the [alleged] stimulant," *Maddox*, 19 F.4th at 66, Plaintiffs fail to establish standing.

### C. Plaintiffs Do Not Allege Any Concrete Harm Arising from Alleged Violations of State and Federal Privacy Laws

Finally, Plaintiffs cannot establish concrete harm from their allegation that BlackRock's continued monitoring resulted in "illegal access to Plaintiffs' sensitive financial information" in violation of unspecified "state and federal data and personal privacy laws." Compl. ¶ 2.

An invasion of a statutory privacy right, without more, does not establish Article III standing. *See TransUnion*, 594 U.S. at 414 (alleging an "injury in law" is not sufficient to establish standing). Even if Plaintiffs plausibly demonstrated that BlackRock violated a state or federal privacy law, they must still show that they were "concretely harmed" by these alleged violations. *Id.* at 427. And to be "concrete," the alleged resulting injury must be within the category of harms that courts have "'traditionally' recognized as providing a basis for a lawsuit in American courts," *id.* at 414, such as "physical, monetary, or reputational harm," *Xu*, 2025 WL 488501, at *3.

Plaintiffs not only fail to identify a harm that falls within any of these categories—they do not assert any concrete harms at all. They have not alleged, for example, that BlackRock disclosed their financial information to third parties. Nor have they claimed that BlackRock misused or benefited from their data in any manner. Absent allegations that show some concrete harm from any alleged unauthorized privacy violations, Plaintiffs cannot establish standing on the basis of these purported violations.

Courts in this district have found standing wanting in closely analogous situations. In *Xu v. Reuters News & Media Inc.* the plaintiff alleged that Reuters misused his IP address to conduct "targeted advertising," making his allegations significantly more concrete than the allegations here. 2025 WL 488501, at *3. The court dismissed the lawsuit against Reuters precisely because the plaintiff did not allege that Reuters' alleged interception of his IP address resulted in any

concrete harm, such as expenses unreasonably incurred as a result of the data collection or a substantial risk of future identity theft or fraud. *Id*. Courts routinely reach a similar conclusion. *See id.* at *4 (collecting cases). Indeed, the Second Circuit has held that even the *disclosure* of collected data does not confer standing unless plaintiffs plausibly allege that their information was intentionally targeted or misused, or that the information was of a uniquely sensitive nature—such as medical records, rather than the routine financial information at issue here. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 303 (2d Cir. 2021); *see also id.* at 298 (describing data at issue, which included "Social Security numbers, home addresses, dates of birth, telephone numbers, educational degrees, and dates of hire").

Article III demands more than the mere assertion of a statutory violation; it requires plaintiffs demonstrate an "injury in fact" that is "concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423 (citations omitted). This constitutional requirement must be satisfied even where "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 426 (citations omitted). Because Plaintiffs have failed to plausibly allege any particularized concrete injury sufficient to establish standing, the Court should dismiss this lawsuit. *See id.* at 417 ("No concrete harm, no standing.").

## II.      Each Of Plaintiffs' Causes Of Action Is Inadequately Pled

Even assuming Plaintiffs have Article III standing (and they do not), each of their claims is legally deficient and must be dismissed under Rule 12(b)(6).

### A.      Plaintiffs Fail to State a Claim Under the Federal Wiretap Act

Plaintiffs' sole federal claim—an alleged violation of the FWA—fails. The FWA prohibits "intentionally intercept[ing]" the contents of "any wire, oral, or electronic communication" through the use of "any electronic, mechanical, or other device," unless a statutory exception

applies. 18 U.S.C. §§ 2510(4), 2511(1)(a); *see also id.* § 2520(a) (establishing private right of action for violation of the FWA). Plaintiffs contend that BlackRock's continued receipt of their personal trading data, even after Hacopian departed the company, amounted to an "interception" of the contents of Plaintiffs' electronic communications in violation of the statute. Compl. ¶¶ 50-66. Even on the face of the Complaint, this theory fails for two independent reasons. *First*, the FWA does not apply whenever one party to a communication—here, Plaintiffs' Approved Brokers—consented to any alleged interception. *Second*, Plaintiffs do not plausibly allege that BlackRock "intercept[ed]" any communication, as that term is defined in the statute, because BlackRock did not acquire any communication contemporaneously with its transmission. Either of these grounds is sufficient to dismiss Plaintiffs' FWA claim.

### 1. Plaintiffs cannot state a FWA claim because Plaintiffs' Approved Brokers consented.

Plaintiffs fail to state a FWA claim because the statute explicitly permits interception where one party to the communication has consented. *See* 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter … to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception."). Plaintiffs' Approved Brokers, undeniably "a party to the communication," consented to BlackRock's receipt of their personal trade information by sending that information to BlackRock via an electronic data feed. *See* Compl. ¶¶ 18, 29-32, 37; *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 514 (S.D.N.Y. 2001) (consent can be inferred rather than explicit); *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010) (defining "party to the conversation" as simply one who "takes part in the conversation"). Even if the Court were to

determine that Plaintiffs have adequately pled the other elements of their FWA claim, their claim should be dismissed on consent alone.

The Complaint makes plain that Plaintiffs' brokers started sending Plaintiffs' trade data to BlackRock with Plaintiffs' consent. Hacopian explicitly agreed to the PTP and its monitoring conditions as part of his employment with BlackRock, a commitment that included authorizing brokers, including Schwab, to transmit his trade information to BlackRock via electronic feed. *See* Compl. ¶¶ 12-21, 72. Plaintiffs allege they did not consent to BlackRock continuing to monitor their trading accounts following the termination of Hacopian's employment, *id*. ¶¶ 22, 24, but Plaintiffs' Approved Brokers, including Schwab, never withdrew *their* consent to transmit the information received from Plaintiffs to BlackRock. As alleged in the Complaint, Schwab continued to provide that information to BlackRock until at least January 6, 2025. *Id.* ¶¶ 29-31, 35-36. *See United States v. Rittweger*, 258 F. Supp. 2d 345, 354 (S.D.N.Y. 2003) ("'Congress intended the [FWA's] consent requirement to be construed broadly.'" (quoting *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987)). Because Plaintiffs do not, and cannot, allege that their Approved Brokers did not consent to the transmission, their FWA claim fails. *See Cohen v. Casper Sleep Inc.*, 2018 WL 3392877, at *4 (S.D.N.Y. July 12, 2018) (rejecting plaintiff's attempt to "contort Defendants' [alleged] conduct into an illegal wiretap claim where consent bars such claims"); *Kwok Sze v. Pui-Ling Pang*, 2015 WL 6867134, at *3 (S.D.N.Y. Nov. 9, 2015) (dismissing FWA claim where one of the parties consented to the communications); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d at 519 (same).

## 2. No "interception" occurred because BlackRock did not acquire any communication contemporaneously with its transmission.

Plaintiffs' FWA claim fails for a separate, equally dispositive reason: They fail to show that BlackRock "intercepted" an electronic communication, a fundamental element of the statute. The vast majority of courts—including "[v]irtually every federal appellate court to have considered the issue," *Verschleiser v. Frydman*, 2023 WL 5835031, at *16 (S.D.N.Y. Sept. 7, 2023)—have held that a defendant "intercepts" a communication under the statute only when it accesses a communication contemporaneous with its transmission (in other words, while the communication is "in flight"), and not after the communication has reached its intended destination or is in electronic storage. *See Tantaros v. Fox News Network, LLC*, 2018 WL 2731268, at *7 (S.D.N.Y. May 18, 2018) (noting that "[c]ourts in this circuit, and elsewhere, have construed the term 'intercept' narrowly to require that the interception of an electronic communication be contemporaneous with the transmission of that communication," and collecting cases); *Snyder v. Fantasy Interactive, Inc.*, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012) (dismissing FWA claim with prejudice where plaintiffs "[pled] no facts suggesting that Defendants accessed their communications during transmission"); *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 446-47, 451 (S.D.N.Y. 2019) (same).

As alleged, Approved Brokers "provide an electronic feed of personal trading activity directly to BlackRock." Compl. ¶ 18. By necessity, Approved Brokers can provide BlackRock this electronic feed of a customer's "personal trading activity" *only after* customers have communicated with the Approved Broker to make a trade. No other reading of the Complaint is plausible: an Approved Broker can transmit to BlackRock information on a customer's "personal trading activity" only if that information is already in its possession. Thus, because the electronic

15

feed Approved Brokers provide to BlackRock necessarily includes only information on communications from customers to their brokers that have already occurred, those communications are not "in flight" by the time BlackRock receives them from the brokers. And because they are not "in flight," the transmission of the electronic feed directly from Approved Brokers to BlackRock is not an "interception" within the meaning of the FWA. *See, e.g.*, *Backhaut v. Apple Inc.*, 148 F. Supp. 3d 844, 849-50 (N.D. Cal. 2015) ("There [is] no interception … if the acquisition of the message occurs while [a] message is in storage, even if it is in temporary storage incidental to the transmission of the communication."), *aff'd*, 723 F. App'x 405 (9th Cir. 2018). Where, as here, "Plaintiffs plead no facts suggesting that Defendants accessed their communications during transmission," dismissal is warranted. *Snyder*, 2012 WL 569185, at *2.

### B. Plaintiffs' State Law Claims Are Legally Deficient

Plaintiffs' state law claims are entirely meritless. Their Section 52-c claim rests on a plain misreading of a statute that does not apply to either plaintiff and provides no private right of action, and their contract claims are untethered from any enforceable contract. Each of Plaintiffs' state law claims should be dismissed with prejudice.

### 1. Plaintiffs' New York Civil Rights Law claim should be dismissed.

Count II alleges that BlackRock violated New York Civil Rights Law Section 52-c by failing to provide Plaintiffs "prior written notice that [BlackRock] would be monitoring … their electronic transmissions … after they separated from the company." Compl. ¶¶ 68-70. This claim fails many times over. *First*, Plaintiffs nowhere allege that BlackRock failed to provide the notice actually required by the statute, which in any event does not apply to either plaintiff. *Second*, the statute reserves enforcement authority to the New York Attorney General through civil penalties

and creates no private right of action for individuals.  *Third*, even if such a private right existed, Plaintiffs assert no distinct injury attributable to the alleged lack of notice.

### a) Section 52-c does not apply here.

Section 52-c does not apply to either plaintiff, or to BlackRock's alleged conduct.  Lusine Hayrapetyan was never a BlackRock employee and so is not covered by the statute at all.  As to Hacopian, the statute was enacted in 2021 and requires only that employers "give prior written notice *upon hiring*" of any electronic monitoring.  N.Y. Civ. Rights Law § 52-c(2)(a) (emphasis added); *see* S.2628, 2021-2022 Leg., Reg. Sess. (N.Y. 2021); *id.* § 2 (providing that Section 52-c took effect 180 days after its enactment—in May 2022).  Hacopian was hired by BlackRock in 2018, and so the statute imposed no obligation on BlackRock with respect to him.  And even if the statute did impose some prospective obligation with respect to current employees (as of the statute's enactment in 2021), Plaintiffs do not allege that BlackRock failed to provide the required notice.  Instead, they contend that BlackRock "failed to give employees and associates prior written notice that it would be monitoring … their electronic transmissions … after they separated from the company."  Compl. ¶ 69.  That is not what Section 52-c covers.  And "there is no basis for creating additional requirements [in the statute] beyond those that are expressly included." *Bilello v. JPMorgan Chase Ret. Bank*, 649 F. Supp. 2d 142, 169-70 (S.D.N.Y. 2009).

### b) Section 52-c does not create a private right of action.

Section 52-c also does not permit private lawsuits by aggrieved persons.  The statute explicitly designates the New York Attorney General as the enforcement authority and specifies civil penalties ranging from $500 to $3,000 based on the number of violations.  N.Y. Civ. Rights Law § 52-c(3).  Where, as here, "the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute, recognition of a private right of action is inconsistent

with the legislative scheme." *Cruz v. TD Bank, N.A.*, 855 F.Supp.2d 157, 172 (S.D.N.Y. 2012) (citations and internal quotation marks omitted), *aff'd*, 742 F.3d 520 (2d Cir. 2013); *see Worldhomecenter.com, Inc. v. KWC Am., Inc.*, 2011 WL 4352390, at *8-9 (S.D.N.Y. Sept. 15, 2011) (declining to recognize private right of action because "the legislative scheme … envisions enforcement by the New York Attorney General, and does not refer to enforcement by private citizens"). Nothing in Section 52-c suggests that the Legislature viewed a private right of action as compatible with the statute's enforcement scheme.

Nor can a private right of action be "fairly implied" in the statute. *Uhr by Uhr v. E. Greenbush Cent. Sch. Dist.*, 675 N.Y.S.2d 704, 705 (App. Div. 1998). If anything, the structure of the New York Civil Rights Law strongly suggests that the Legislature intended to foreclose private lawsuits to enforce Section 52-c. Section 52-c is wedged between two statutory provisions explicitly conferring private rights of action for other privacy violations. *See* N.Y. Civ. Rights Law § 52-b ("Private right of action for unlawful dissemination or publication of an intimate image"); *id*. § 52-d ("Private right of action for unlawful dissemination or publication of a personal image"). Where the Legislature wanted to give employees a private right of action to sue under Section 52, it did so. It did not do so here. *See DeRusso v. Church Aid of Protestant Episcopal Church in the Town of Saratoga Springs, Inc*., 223 N.Y.S.3d 442, 444 (App. Div. 2025) ("The failure of the Legislature to include a matter within a particular statute [indicates] that its exclusion was intended." (citations and internal quotation marks omitted)); *Simpson v. New York City Transit Auth.*, 491 N.Y.S.2d 645, 657 (App. Div. 1985) ("Had the legislature intended to create a private right of action for violations of [Section 52-c], it could have done so.").

### c) Plaintiffs lack standing to sue under Section 52-c.

Even assuming Plaintiffs could overcome these statutory hurdles, their claim would still fail due to the absence of any cognizable injury. In addition to the general standing deficiencies discussed above, Plaintiffs have failed to establish any cognizable injury traceable to a violation of this notice statute. Standing is not "dispensed in gross," and Plaintiffs must demonstrate standing for each claim "[they] seek[] to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (cleaned up). The Complaint vaguely asserts that Plaintiffs "have been damaged by BlackRock's violations," Compl. ¶ 70, but it identifies no specific harm resulting directly from the lack of statutory notice. Plaintiffs bringing claims under New York state laws, like those asserting rights under federal law, must "demonstrate [an] injury in fact," *Zachary*, 716 F. Supp. 3d at 345. Here, Plaintiffs do not even attempt to "allege [a] concrete harm resulting from" an alleged "failure to provide … notice." *Id.*

### 2. The breach of contract claim should be dismissed.

Plaintiffs assert a breach of contract claim based on the PTP, claiming that the policy creates enforceable contractual obligations that BlackRock violated by continuing to monitor Plaintiffs' accounts after Hacopian's employment ended. Compl. ¶¶ 71-76. This claim, too, necessarily fails.

To start with the most basic point, Lusine Hayrapetyan was never an employee of BlackRock and so has no basis even to assert a contract claim under the PTP. As to Hacopian, the claim fails for at least two independent reasons. *First*, the PTP is not an enforceable contract; it is an internal company policy and does not give rise to legally binding obligations. *Second*, even assuming the PTP qualifies as a contract, Plaintiffs fail to point to any provision prohibiting the monitoring of accounts post-employment.

Under settled New York law, an employee handbook or policy does not create contractual obligations unless it expressly manifests an intent by the employer to be legally bound. *See DeMicco v. Home Depot USA, Inc.*, 101 F. Supp. 2d 122, 126 (E.D.N.Y. 2000) (employee handbook is not a contract unless it contains "mandatory and unqualified terms" indicating an intent "to establish an express agreement"); *see also Lobosco v. N.Y. Tel. Co./NYNEX*, 751 N.E.2d 462, 465 (N.Y. 2001) ("Routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements."); *Kunda v. Caremark PHC, LLC*, 119 F. Supp. 3d 56, 64 (E.D.N.Y. 2015) (in order for an employee handbook to become an enforceable contract, "it would have to contain some specific limitation on [the employer's] right to terminate its employees at-will.").

Nothing in the PTP reflects the required intent. On the contrary, the PTP imposes conditions of employment exclusively on BlackRock employees and contingent workers, without making any reciprocal promises that would bind the company. *See, e.g.*, PTP at 8 (requiring that employees "attest to the accuracy and completeness of all information … provided to BlackRock on an annual basis"); *id.* at 7 ("BlackRock will determine on a case-by-case basis what remedial action should be taken in response to any violation" of the PTP); *id.* at 1 (PTP governs "the personal trading and investments of all [BlackRock] employees"). Because a valid contract requires mutual promises, the PTP does not constitute a contract. *See United States v. Parra*, 302 F. Supp. 2d 226, 238 (S.D.N.Y. 2004), *aff'd*, 249 F. App'x 226 (2d Cir. 2007). And since the PTP is not a contract, Plaintiffs' breach of contract claim necessarily fails.

Even if the Court were to conclude that the PTP constituted an enforceable contract, Plaintiffs' claim would still fail because they have not identified any specific provision of the PTP that BlackRock allegedly breached, as is required under New York law. *See Benihana of Tokyo,*

*LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017). Indeed, Plaintiffs do not point to any language in the PTP restricting BlackRock in any way—much less any provision that requires it to cease monitoring its employees' brokerage accounts upon their departure. Nor do Plaintiffs offer any grounds for inferring such an obligation from the PTP's text. *See RM 14 FK Corp. v. Bank One Tr. Co.*, 831 N.Y.S.2d 120, 123 (App. Div. 2007) ("There is no basis 'to interpret an agreement as impliedly stating something which the parties have neglected to specifically include'").

### 3. The implied covenant claim should be dismissed.

Plaintiffs' claim that BlackRock breached the implied covenant of good faith and fair dealing by continuing to monitor Plaintiffs' accounts and by misrepresenting itself as Hacopian's employer to his broker (Compl. ¶¶ 80-84) fails right out of the gate because an implied covenant claim is "dependent upon the existence of an enforceable contract" and, as explained above, the PTP is not an enforceable contract. *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001), *aff'd*, 279 F. App'x 14 (2d Cir. 2008).

In any event, courts applying New York law "do[] not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing" when that claim is "based upon the same facts" as Plaintiffs' breach of contract claim. *Trustpilot Damages LLC v. Trustpilot, Inc.*, 2021 WL 2667029, at *9 (S.D.N.Y. June 29, 2021) (citations omitted) (Rakoff, J.). Plaintiffs' breach of contract and implied covenant claims are virtually indistinguishable. As to both, Plaintiffs assert that BlackRock has breached the PTP by continuing to intercept and monitor ex-employees' accounts and falsely representing itself as Hacopian's employer. Compl. ¶¶ 75, 83. And Plaintiffs base both claims on allegations that this supposed breach resulted in a delayed disbursement from their broker. *Id.* ¶¶ 76, 84. Because the two claims are based on the same

factual predicates, the implied covenant claim cannot stand on its own. *See, e.g.*, *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (dismissing implied covenant claim on this basis).

## III. Plaintiffs' Complaint Should Be Dismissed With Prejudice

In the Second Circuit, plaintiffs are not entitled as a matter of right to amend deficient pleadings before dismissal with prejudice; courts routinely deny leave to amend when a complaint is facially inadequate and any attempt at amendment would be futile. *See, e.g.*, *Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644-45 (2d Cir. 2009); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court should dismiss Plaintiffs' claims with prejudice because they are deficient as a matter of law and cannot be cured through amendment.

## CONCLUSION

This Court should dismiss all of Plaintiffs' claims against BlackRock, Inc. with prejudice.

Dated: April 18, 2025

Respectfully submitted,

By: */s/ Alan E. Schoenfeld*
Alan E. Schoenfeld
Lydia Turnage (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
Telephone: (212) 230-8800
*alan.schoenfeld@wilmerhale.com*
*lydia.turnage@wilmerhale.com*

Bardia Vaseghi (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington D.C. 20037

Telephone: (212) 230-8855
*bardia.vaseghi@wilmerhale.com*

*Counsel for Defendant BlackRock, Inc.*

**LOCAL RULE 7.1(c) CERTIFICATE OF COMPLIANCE**

I hereby certify that this Memorandum of Law in Support of BlackRock Inc.'s Motion to Dismiss complies with the formatting requirements of Local Rule 7.1(b) and the length limitation imposed by Local Rule 7.1(c) as follows.

This Memorandum was prepared in Times New Roman size 12 font using Microsoft Word. The Memorandum contains 6,592 total words. To count the number of words in the Memorandum, I used the word-count software in Microsoft Word, applied specifically to include all text— including headings, footnotes, and quotations—except for the text in the caption, table of contents, table of authorities, and signature block.

Dated:  April 18, 2025

*/s/ Alan E. Schoenfeld*
Alan E. Schoenfeld