UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

ARMEN HACOPIAN et al,

                    Plaintiffs,

              v.                                          25-cv-2361 (JSR)

BLACKROCK, INC.
and JOHN DOE ENTITY 1,

                    Defendants.

-------------------------------------

JED S. RAKOFF, U.S.D.J.


                    OPINION & ORDER

    This is a motion to dismiss brought by defendant BlackRock,

Inc. ("BlackRock") in response to a purported class action filed

by plaintiffs Armen Hacopian, a former BlackRock employee, and his

wife, Lusine Hayrapetyan, on behalf of themselves and other former

employees of BlackRock. In the complaint, plaintiffs allege that

BlackRock knowingly intercepted their personal trading accounts

following the termination of Hacopian's employment with BlackRock.

    Plaintiffs assert three claims: (1) a claim under the Federal

Wiretap Act, 18 U.S.C. §§ 2510 *et seq.* (the "Wiretap Act" or the

"Act"), against BlackRock and "John Doe Entity 1," arising from

BlackRock's alleged knowing and intentional interception and

monitoring of plaintiffs' personal trading accounts after

Hacopian's employment ended; (2) a claim under New York state law

for breach of contract, arising from alleged violations of

BlackRock's Global Personal Trading Policy ("PTP" or the

-1-

"Policy"), which governs the disclosure obligations relating to personal trading information of BlackRock employees; and (3) a claim for breach of the implied covenant of good faith and fair dealing, also premised on the alleged violations of the PTP. See Complaint ("Compl.") ¶¶ 50-84.[1] With respect to the injuries, plaintiffs allege that BlackRock's illegal monitoring of their personal trading and investment information caused emotional distress, aggravation of certain preexisting health conditions, and, in one instance, a delayed receipt of a $5,000 bonus payment.

After careful consideration of the parties' submissions and oral argument held on May 23, 2025, the Court issued a "bottom-line" Order granting in full the motion of defendant BlackRock to dismiss the complaint. This Opinion sets forth the reasons for the ruling.

## I.    Background

### A. BlackRock's Personal Trading Policy

BlackRock is the world's largest asset manager and an employer of thousands of people in the United States alone. Compl. ¶ 7. As part of its compliance policy, BlackRock requires its employees to adhere to the PTP. The PTP governs the disclosure obligations for

---

[1] A further claim, for alleged violation of New York Civil Rights Law § 52-C, has been withdrawn by plaintiffs and is consequently hereby dismissed. Memorandum of Law in Opposition to Defendant BlackRock, Inc.'s Motion to Dismiss, at 2 (ECF No. 21).

personal trading and investments by BlackRock employees, as well as contingent workers, including temporary staff and interns. Compl. ¶¶ 3, 12.

The PTP requires individuals to disclose any brokerage or investment accounts — including private investments, trusts, or investment clubs — in which they make investment decisions, exercise direct influence or control, or hold a direct or indirect beneficial ownership interest. Compl. ¶ 13. The Policy extends to "brokerage and investment accounts of spouses, domestic partners, dependent children, and any other person on behalf of whom the person subject to the PTP makes investment decisions or has direct influence or control." Compl. ¶ 14. Obvious purposes of this policy are to prevent insider trading, avoid conflict of interest, and provide other perfectly appropriate compliance safeguards.

Under the Policy, each employee must, within 10 days of joining BlackRock, provide their securities holding information for themselves and any other subjects to which the Policy applies, together with the relevant account information. Compl. ¶ 15. Every subject of the Policy must then conduct their personal trading through a BlackRock Approved Broker, and prior approval through BlackRock's Personal Trading Assistant platform is also required before individuals subject to the policy are permitted to undertake "certain personal investments." Compl. ¶¶ 16-17. "Approved Brokers generally provide an electronic feed of employee personal trading

activity directly to BlackRock." Compl. ¶ 18. The PTP does not expressly specify whether or when this electronic feed will be shut off following an employee's termination or departure from BlackRock. See generally PTP at 1-19 (ECF No. 18-1).

Plaintiff Armen Hacopian joined BlackRock in July 2018 as a Vice President in the firm's Manhattan headquarters. Compl. ¶ 19. Pursuant to the PTP, Hacopian disclosed all of his and his family's brokerage or investment accounts. Compl. ¶ 21. Also pursuant to the PTP, Hacopian and his family members conducted their personal trading through a BlackRock-Approved Broker. Id.

Hacopian's employment with BlackRock ended on February 9, 2024, as part of a company-wide reduction in force, which Hacopian alleges created a significant financial strain on him and his family. Compl. ¶¶ 5, 23, 38. Nevertheless, Hacopian alleges that BlackRock continued to monitor and intercept his and his family's personal financial information through receiving an electronic feed of their trading activity from the Approved Broker, including after plaintiffs' brokerage accounts were migrated from TD Ameritrade to Charles Schwab ("Schwab") on or about May 2024. Compl. ¶¶ 28-31.

On January 2, 2025, almost a year after Hacopian was terminated from BlackRock, Schwab informed Hacopian that it required approval from BlackRock to deposit a $5,000 bonus payment in Hacopian's brokerage account. Compl. ¶ 37. However, as a

condition precedent to the receipt of that bonus, Schwab needed BlackRock's approval because BlackRock continued to monitor and represent itself (incorrectly) as Hacopian's employer with respect to Hacopian's financial accounts. Compl. ¶ 37. As a result, Hacopian's receipt of that bonus was delayed by approximately one week. Id. On or about the same day, Hacopian emailed BlackRock's corporate compliance and human resource teams and demanded that BlackRock "stop monitoring [his] accounts." Compl. ¶ 33. On January 6, 2025, BlackRock employee Lamar Holman informed Hacopian that he would have the issue "addressed ASAP." Compl. ¶ 35. In that January 6 email, Holman allegedly instructed two other BlackRock employees to "please have all the below ex-employees accounts removed from monitoring." Compl. ¶ 36 (emphasis in the original).

## II.  Standing

Defendants first move to dismiss plaintiffs' complaint for lack of standing. Standing under Article III of the Constitution is jurisdictional in nature, and a claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d

Cir. 2000).[2] When, as here, a defendant has brought a Rule 12(b)(1) motion, "based solely on the allegations of the complaint or the complaint and exhibits attached to it," the Court accepts as true all the material factual allegations of the complaint and draws all reasonable inferences in favor of plaintiffs. Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56-57 (2d Cir. 2016). The burden is on plaintiffs to allege facts that "affirmatively and plausibly suggest" that they have standing to sue. Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).

To establish Article III standing, plaintiffs must show (1) that they "suffered an injury in fact," (2) that the injury "is fairly traceable" to defendants' challenged conduct, and (3) that the injury "is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). Defendants here only challenge the first requirement of standing, i.e., that plaintiffs must show "an injury in fact that is concrete, particularized, and actual or imminent" with respect to each claim. TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). To be concrete, an injury must be "real, and not abstract." Id. at 424. (quoting Spokeo, Inc., 578 U.S. at 340 (2016)). "[W]hether a harm qualifies as 'concrete' hinges on 'whether the alleged injury

---

[2] Unless otherwise indicated, all case quotations omit internal alterations, brackets, citations, ellipses, quotations, and quotation marks.

to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'" Maddox v. Bank of N.Y. Mellon Tr. Co., N.A., 19 F.4th 58, 63 (2d Cir. 2021) (quoting TransUnion, 594 U.S. at 424). "The Court [has] recognized that physical and monetary harms, along with other traditional tangible harms, readily qualify as concrete, and that certain intangible harms, such as reputational harm, qualify as well." Id.

In deciding whether intangible harm "manifests concrete injury, a court is properly respectful of Congress's judgment in affording a legal remedy for the harm." Strubel v. Comenity Bank, 842 F.3d 181, 188 (2d Cir. 2016); see also Spokeo, 578 U.S. at 331. However, "Congress's role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Spokeo, 578 U.S. at 341; Lujan v. Defs. of Wildlife, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."). Accordingly, a plaintiff cannot "allege a bare [statutory] procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Spokeo, 578 U.S. at 341.

Defendants argue that Hacopian has not been "concretely harmed by a defendant's statutory violation" based on the alleged injuries of (1) a delay in receipt of a $5,000 bonus payment from the broker, see Compl. ¶¶ 37, 76; (2) alleged emotional distress, aggravation of "certain preexisting health conditions," and "significant loss of sleep" caused by BlackRock's alleged knowledge that plaintiffs "suffered financially" and "dr[ew] down" their retirement accounts as a result of Hacopian's termination, Compl. ¶ 38; and (3) BlackRock's alleged "illegal access to [and monitoring of] Plaintiffs' sensitive financial information," Compl. ¶ 2. The Court concludes, however, that plaintiffs have adequately alleged standing with respect to all of their remaining claims.

In regard to the wiretap claim, a Wiretap Act violation exists when any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Wiretap Act protects individuals' right to privacy in electronic communications. See DirecTV, Inc. v. Webb, 545 F.3d 837, 850 (9th Cir. 2008) (stating that the Wiretap Act's "emphasis on privacy is evident in both the legislative history of the Wiretap Act and in the breadth of its prohibitions"). Invasion of privacy has also been long actionable at common law. See Restatement (Second) of Torts §§ 652A-I (noting

-8-

that the right to privacy was first accepted by an American court in 1905, and that it is "now recognized in the great majority of the American jurisdictions that have considered the question."). One such type of invasion of privacy is intrusion upon seclusion, which "does not depend upon any publicity given to the person whose interest is invaded or to his affairs" but "consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Id. § 652B.

A typical case of invasion by intrusion includes, for example, searching someone's "safe or his wallet" or "examining [one's] private bank account." Id. This harm is analogous to the harms alleged by plaintiffs, viz., that BlackRock continued intruding on their family trading accounts after Hacopian had been terminated by BlackRock. Hacopian's termination caused the family financial distress, including the alleged necessity to draw down their retirement accounts early. Compl. ¶ 38. Hacopian further alleges that he felt what perhaps everyone would feel if forced to turn over the contents of their wallet in times of financial difficulties: humiliation and distress that he alleges "aggravated certain preexisting health conditions, and caused significant loss of sleep." Id. Finally, Hacopian asserts that in this financial distress, his $5,000 payment from his broker was delayed for a

week because his broker wrongly required approval from BlackRock, which allegedly continued to monitor his accounts and represent itself (incorrectly) as his employer. Compl. ¶ 37. In similar circumstances, other courts have held that plaintiffs have sufficiently alleged standing, even without a showing of additional harm beyond the invasion of the plaintiffs' right to privacy. See Matera v. Google Inc., No. 15-CV-4062-LHK, 2016 WL 5339806 at *8-14 (N.D. Cal. Sept. 23, 2016) (concluding that the "alleged violations of Plaintiff's statutory rights under the Wiretap Act and CIPA constitute concrete injury in fact"); Romero v. Securus Technologies, Inc., 216 F.Supp.3d 1078, 1087-89 (S.D. Cal. 2016) (adopting the court's reasoning in Matera).

Accordingly, the Court concludes that plaintiffs have standing to sue under the Wiretap Act. And even though plaintiffs "need not allege any additional harm beyond the one Congress has identified," they did so here by alleging that as a result of intrusion into their privacy, they suffered from mental and physical distress and a delayed receipt of money. Spokeo, 578 U.S. at 342. As for the contractual and quasi-contractual claims, the delay in transfer of the $5,000 payment constituted a small but real loss of the true value of money sufficient to meet the requirements of standing. Porsch v. LLR, Inc., 380 F. Supp. 3d 418, 424 (S.D.N.Y. 2019) ("[T]emporary deprivation of money to which a plaintiff has a right constitutes a sufficient injury in

-10-

fact to establish Article III standing."); <u>Rankine v. Levi Strauss & Co.</u>, 674 F. Supp. 3d 57, 63-64 (S.D.N.Y. 2023) (collecting cases).

## III. Sufficiency of the Pleadings

Even though plaintiffs therefore withstand defendants' challenge to standing, defendants also moved under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' claims for failure to state a claim.

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." <u>Rescuecom Corp. v. Google, Inc.</u>, 562 F.3d 123, 127 (2d Cir. 2009). In so doing, the Court "is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken." <u>Automated Salvage Transp., Inc. v. Wheelabrator Env't Sys., Inc.</u>, 155 F.3d 59, 67 (2d Cir. 1998). And while the Court must accept as true all factual allegations, "[t]hreadbare recitals of the elements of a

-11-

cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

The Court considers each of plaintiffs' claims in turn.

## A. Plaintiffs' Federal Wiretapping Claim

The Wiretap Act provides a private right of action against "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication[.]" 18 U.S.C. § 2511(1)(a). BlackRock argues that plaintiffs cannot make out a plausible Wiretap Act claim for two independent reasons: (1) no statutorily required "intercept[ion]" occurred as BlackRock did not acquire any communication contemporaneously with its transmission, and (2) plaintiffs' approved brokers consented to the alleged wiretap.

### i. Interception

BlackRock argues that plaintiffs cannot make out a Wiretap Act claim because BlackRock did not "intercept" the electronic communication in question, a statutory element that BlackRock defines as being limited to intercepting communication contemporaneously with its transmission.[3] Memorandum of Law in

_____

[3] Some courts that have applied this contemporaneity requirement have referred to it as intercepting a communication "in flight" in the same sense as "an interception in a football game." Speer v. Saenz, No. CV H-13-1538, 2015 WL 12551069, at *8

-12-

Support of Defendant BlackRock, Inc.'s Motion to Dismiss, at 15 (ECF No. 17) ("MTD Mem."). The Second Circuit has not yet addressed whether simultaneous interception is required under the Act. However, every circuit that has considered the issue has defined it narrowly and held that "intercept[ion]" "must occur contemporaneously with transmission." See, e.g., Luis v. Zang, 833 F.3d 619, 627 (6th Cir. 2016) ("Every circuit court to have considered the matter has held that an 'intercept' under the [Act] must occur contemporaneously with transmission.") (citation omitted).[4] Here, BlackRock argues that any "electronic feed of a [customer's] personal trading activity" that brokers provide to BlackRock under the PTP is inevitably not contemporaneous because brokers can only provide that information after customers have communicated with the broker to make a trade. MTD Mem. at 15-16.

Under the Act, "intercept" is defined as the "aural or other acquisition of the contents of any wire . . . communication through the use of any electronic, mechanical, or other device." 18 U.S.C.

--------

(S.D. Tex. Feb. 19, 2015); Glob. Policy Partners, LLC v. Yessin, 686 F. Supp. 2d 631, 638 (E.D. Va. 2009) ("In other words, these statutes give 'intercept' its common meaning, which is perhaps best understood through a football analogy. In American football, a ball can only be intercepted when it is 'in flight.'").

[4] At least some courts in this district were persuaded by these decisions and adopted this "narrow" definition of "intercept," which excludes storage. See, e.g., Snyder v. Fantasy Interactive, Inc., 2012 WL 569185 (S.D.N.Y. Feb. 9, 2012); Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 759 F.Supp.2d 417, 430-31 (S.D.N.Y.2010).

§ 2510(4). Such acquisition occurs "when the contents of a wire communication are captured or redirected in any way." United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992). However, the Ninth Circuit has held that "[n]o new interception occurs when a person listens to or copies the communication that has already been captured or redirected." Noel v. Hall, 568 F.3d 743, 749 (9th Cir. 2009). In so concluding, that court pointed to separate prohibitions on the "use" and "disclos[ure]" of intercepted wire communications contained in § 2511(c) and (d) of the Wiretap Act, noting that "Congress in its wisdom presumably would not have added a separate section providing a redundant section [regarding the use and disclosure of intercepted communications.]" Id. (citing United States v. Turk, 526 F.2d 654, 658 (5th Cir. 1976), cert. denied, 429 U.S. 823 (1976)).

Further, the distinction drawn by Congress between "electronic communication" and "electronic storage" is critical. The statutory definition of "intercept" applies solely to the former, meaning that "intercept applies solely to the transfer of electronic signals." Luis, 833 F.3d at 627-28 (concluding thereby that the Wiretap Act contains a "contemporaneity requirement" because "[o]nce the transmission of the communication has ended, the communication ceases to be a communication at all," and instead "[t]he former communication instead becomes part of 'electronic storage'"); Steve Jackson Games, Inc. v. United States Secret

-14-

Service, 36 F.3d 457, 461-62 (5th Cir. 1994). This Court finds the reasoning of these courts persuasive and adopts it. Accordingly, the Court concludes that because Congress clearly distinguished between "electronic information" and "electronic storage" but chose only to prohibit interception of the former, Congress must not have intended to capture stored communication in the scope of § 2511.

While plaintiffs argue in their brief that contemporaneity is not required by the Wiretap Act, during the oral argument, plaintiffs raised an alternative theory that BlackRock contemporaneously intercepted the brokers' relaying of plaintiffs' communications to their brokers. Tr. 8:19-9:2. But under that theory, plaintiffs would have no standing to bring this suit because they were not parties to the communications. Further, "[o]nce the transmission of the communication" between plaintiffs and their brokers "has ended, the communication cease[d] to be a communication at all," and instead the former communication became part of "electronic storage," Luis, 833 F. 3d at 627, a term statutorily defined to include "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17). Such transmission fails the contemporaneity requirement under the Wiretap Act.

Plaintiffs also cite the Seventh Circuit's decision in United States v. Szymuszkiewicz, 622 F.3d 701 (7th Cir. 2010), to argue that "contemporaneity" is not required under the Act. But plaintiffs plainly misread that case. The Seventh Circuit held that the communication in that case was, in fact, "contemporaneous." Id. at 705-706. Moreover, the facts in Szymuszkiewicz are distinguishable, involving a defendant, a former IRS revenue officer, who challenged his conviction under the Wiretap Act based on evidence put forward by the prosecution that the defendant set up a Microsoft Outlook rule that automatically and simultaneously forwarded emails sent by his supervisor's account to his own account. Id. at 703. In other words, the Seventh Circuit did not disagree that the interception must be contemporaneous but simply held that a situation involving automatic and near-simultaneous forwarding met this requirement.

While some courts have declined to extend the Act to such facts, see e.g., Bunnell v. Motion Picture Ass'n of Am., 567 F. Supp. 2d 1148, 1152-54 (C.D. Cal. 2007), plaintiffs here do not allege facts that would support a showing of contemporaneous acquisition even under the approach taken in Szymuszkiewicz. The Complaint merely asserts that "Approved Brokers generally provide an electronic feed of personal trading activity directly to BlackRock." Compl. ¶ 18. There are no allegations that the plaintiffs' communication to brokers was forwarded to BlackRock in

real time, or the like.[5] Thus, even in the speculative event that
this Court adopted the Seventh Circuit approach, the absence of
any allegation of such simultaneous forwarding is fatal to the
plaintiffs' claim here.

   *ii. Consent*

   BlackRock argues that plaintiffs' broker, who is a party to
the communication because it transmits plaintiffs' financial
information to BlackRock, consented to the transmission of
plaintiffs' trading data because plaintiffs have never withdrawn
their consent to having the broker do so after the termination of
Hacopian's employment. While this argument may have merit, the
Court does reach it because it has already determined that
plaintiffs' Wiretap Act claim fails for the lack of
contemporaneity.

   B. <u>State Law Breach of Contract and Implied Covenant of
      Good Faith and Fair Dealing Claims</u>

   Plaintiffs further assert a claim for breach of contract based
on the PTP, contending that the company policy creates enforceable
contractual obligations that BlackRock violated by continuing to
illegally monitor plaintiffs' accounts after Hacopian's employment

_____

   [5] Although at oral argument, plaintiffs asked for the
opportunity to provide further particulars of how Schwab shared
their trading data with BlackRock, Tr. 28:2-10, at no point did
they suggest this could indicate any evidence of simultaneity
remotely like that in <u>Szymuszkiewicz</u>.

with BlackRock had been terminated. Compl. ¶¶ 71-76. BlackRock counters that this claim fails, in part, because the PTP is an internal company policy that does not give rise to legally binding obligations. Alternatively, BlackRock contends that even if the PTP constitutes an enforceable contract, plaintiffs have failed to point to any provision of the PTP prohibiting the monitoring of accounts post-employment. The Court first addresses BlackRock's second argument, namely, whether Plaintiffs have sufficiently alleged a breach of any provision of the PTP, assuming arguendo that the PTP constitutes an enforceable contract.

Under New York law, a cause of action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted); see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 921 N.Y.S.2d 260, 264 (2011) (same). Plaintiffs argue that BlackRock violated Sections 5.2 and 15 of the PTP by continuing to monitor plaintiffs' personal trading accounts for nearly a year following Hacopian's separation from the company. Section 15 of the PTP states that:

> Employee personal trading is subject to monitoring by
> BlackRock. BlackRock will determine on a case by case
> basis what remedial action should be taken in response
> to any violation. This may include disgorgement of
> profits and/or limiting an employee's personal trading

for some period. Violations of this policy, including
but not limited to violations relating to trading
activity and the obligation to provide information to
BlackRock, may result in disciplinary action, up to and
including termination.

Schoenfeld Decl., Ex. 1. Section 5.2 states in relevant part:

Spousal accounts require disclosure, regardless of
preclearance exemption status and are subject to
periodic monitoring. Employees may be required to supply
a quarterly statement for such accounts. When such
requests are made employees must provide the statements
to the Legal & Compliance within 30 days of the request.
Reach out to your regional Core Compliance team for
details regarding the approval process.

Id. "The best evidence of what parties to a written agreement
intend is what they say in their writing." Slamow v. Del Col, 79
N.Y.2d 1016, 1018 (1992). Here, the relevant provisions of the PTP
impose duties and obligations on BlackRock's employees, and by
extension, on the employees' family members. The provisions
clearly do not impose any obligations on BlackRock with respect to
former employees. The Court declines the invitation to read into
the PTP obligations it plainly does not contain. Since plaintiffs
cannot show that BlackRock breached any obligations owed to them
under the PTP, their breach of contract claim is dismissed.

Independently, moreover, BlackRock argues that the PTP is not
a contract, but rather a mere policy that does not impose
reciprocal promises binding on the company. Consequently,
BlackRock contends that the PTP does not reflect an intent to be
bound. In response, plaintiffs cite several cases in which courts
have found that employer policies or employee handbooks created

-19-

enforceable obligations. <u>See, e.g.,</u> <u>Albanese v. Citicapital Corp.</u>, 2007 WL 9724567, at *6 (E.D.N.Y. Mar. 26, 2007) (finding that a discretionary bonus policy was an agreement). However, those cases are distinguishable because they involved policies that contained specific, enforceable obligations. In contrast, plaintiffs seek to enforce provisions of the PTP that do not impose obligations on BlackRock with respect to former employees. <u>See</u> Compl. ¶ 75 ("BlackRock has breached the PTP by continuing to intercept and monitor the financial accounts of plaintiffs and other members of the Class after the term of their employment or other work engagement with BlackRock has ended."). Plainly, the PTP does not create an enforceable contract between BlackRock and its employees that would prohibit BlackRock from monitoring the accounts of former employees or non-employees.[6]

Finally, plaintiffs' claim for the implied covenant of good faith and fair dealing fails because it is "dependent upon the existence of an enforceable contract." <u>United Mag. Co. v. Murdoch Mags. Distrib., Inc.</u>, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001), <u>aff'd</u>, 279 F. App'x 14 (2d Cir. 2008). Since the PTP does not

---

[6] Even as a matter of policy, one could understand that BlackRock might want to monitor its former employees trading information to prevent insider trading based on information the employee obtained while still at BlackRock. But for the foregoing reasons, the court need not reach what limits might be imposed by such a policy if it were part of a contractual obligation by BlackRock, since here there is no such obligation.

create an enforceable contract with respect to plaintiffs' claims, the implied covenant claim must also be dismissed.

For the foregoing reasons, the Court hereby dismisses plaintiffs' claims. The Clerk to enter judgment.

Dated:    New York, NY

June 18, 2025                                  JED S. RAKOFF, U.S.D.J.